UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| GREAT LAKES ACQUISITION CORP. d/b/a ELARA CARING, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-10781 |
| PARADIGM LIVING CONCEPTS, LLC d/b/a PARADIGM HEALTH, AMY STONE and MITASHA OWENS, | ) ) ) ) | Hon. Bernard A. Friedman

Magistrate Judge Michael J. Hluchaniuk |
| Defendants. | ) | |

## DECLARATION OF AMY STONE

I, Amy Stone, in accordance with 28 U.S.C. § 1746, state as follows:

1. I am a competent adult with personal knowledge of the matters stated in this declaration. If called upon to testify under oath, my testimony would be the same as in this declaration.

2. I am 45 years old. I am a single mother with two teenagers – a daughter who is a senior in high school and a son who is a freshman in high school. I was born and raised in Ohio. I moved to Indiana in 1993 to attend Anderson University and have lived in Indiana ever since.

3. I have served as a community volunteer for various organizations. I was President of the Muncie Noon Optimist Club, Member of Women in Business, Muncie Chapter, Chamber of Commerce member and Habitat for Humanity Committee Member and a Soccer coach for Delaware County Futbol Club.

4. I graduated from Graham High School in 1993. I went to college at Anderson University, a small private-Christian university in Anderson, Indiana, and graduated in 1997 with a B.A. in Marketing. I am currently pursuing my MBA through online course.

5. After college, I worked as a Director of Marketing and Admissions at a nursing home in Muncie, Indiana from 2009-2011. From 2011-2014, I worked as a Central Indiana Sales Agent for VNA Healthtrends, a home health care agency. I managed sales of home care services.

6. In March of 2015, I began working for Great Lakes Acquisition Corporation, then doing business as Great Lakes Caring ("GLC"), as a Patient Care Coordinator in central Indiana. At that time, GLC was a family owned, regional company based in Michigan. GLC provided home health and hospice services. GLC did business in Michigan, Illinois and Indiana.

7. GLC required me to sign a form employment agreement. The employment agreement form was given to me during my onboarding training. A copy of my employment agreement ("Employment Agreement") is attached as Exhibit G to GLC's Motion for Preliminary Injunction. [ECF No. 5-8].

8. The GLC onboarding training was at corporate headquarters in mid-March 2015. The training was for all new hires and was one week long. The training I received while I was at corporate was human resource on-boarding completion only. Because I was a seasoned home healthcare representative, I received very little training by GLC before I was released into my territory.

9. As a Patient Care Coordinator for GLC, I managed sales of home health services and called on accounts or referral sources with regard to home health services. I worked out of GLC's Kokomo branch and would make weekly visits to call on hospitals, doctors and skilled nursing facilities in my territory. My territory was Muncie (Delaware County), Anderson (Madison County), Marion (Grant County), New Castle (Henry County), Tipton and Wabash counties. This was my sales territory throughout my employment with GLC/Elara Caring. My territory did not change. I only marketed home health services. I did not market hospice

services. I educated referral sources on home health qualifiers and accepting diagnoses. I conducted presentations to case management departments to discuss service areas and referral process management.

10. If I got a referral for a home health patient, I would send the referral information to GLC's intake team and assist with coordinating doctor orders and scheduling of services. I would also contact the patient's family and answer questions about GLC's home care services.

11. In February 2018, I was told that I was going to get a new supervisor (Matt Blake). I was also told that I would be considered for a sales training role which would allow me to travel and train other sales representatives. I was also told that the bonus structure would change in a more positive way. A week or so later, I was informed that a different person (Justin Steele) was going to be my supervisor, not Matt Blake. Mr. Steele told me that he was going to try and honor the company's commitments regarding the changes, but those changes never came to fruition. I was not given a sales training role. The bonus structure did not change. To compound the matter, my existing bonuses were not paid on time.

12. In April 2018, I and other employees of GLC received an email from corporate informing us that GLC was merging with two other large home health companies (Dallas-Texas based Jordan Health Services and Cromwell-Connecticut based National Home Health Care) to form a large network of companies known as Elara Caring. We were told that the merger would be a great thing; however, that was not my experience.

13. After the merger in May 2018, GLC began doing business as "Elara Caring." GLC went from being a small regional operation with around 5,000 employees and a family feel, to a large or part of a large, national network with over 35,000 employees and a corporate feel.

Management did not seem stable. Elara Caring went through several Chief Executive Officers, and I had four different supervisors in a relatively short period of time.

14. At a quarterly business meeting following the merger, I was asked to sign a new employment agreement – to replace my Employment Agreement. I was told that Regional said we needed to sign new agreements with a new non-compete, because of the merger and change of entities to Elara Caring. I did not sign the new employment agreement that was presented to me. My title changed to Account Executive. My responsibilities and territory remained the same.

15. Elara Caring kept the home health and hospice lines of business separate. I only marketed home health services for GLC/Elara Caring. I did not receive any additional training from GLC or Elara Caring after the merger.

16. After the merger, Elara Caring also made changes that did not settle well with patient referral sources and made my job more difficult. For example, in August 2018, Elara Caring pulled out of contracted (private) insurance and began taking only Medicare patients. Patient referral sources that I worked with, such as the Veteran's Administration (VA), which was one of my larger referral sources, expressed their frustrations to me about the changes. In or around mid-2019, Elara Caring began accepting United Insurance and Anthem Blue Cross Blue Shield.

17. I began considering working for a different company. One of the companies I considered was Paradigm Health ("Paradigm"), a small home health, hospice, palliative and wellness care company in Indianapolis, Indiana. I knew Paradigm's Vice President of Business Development. I interviewed with several companies, including Paradigm. My interview with Paradigm was in mid-October 2019. I was impressed with the people I met with from Paradigm

and with Paradigm's philosophy. Paradigm seemed focused on patient care and taking care of its employees, like GLC was before the merger with or into Elara Caring. Shortly after my interview with Paradigm, I received a job offer from Paradigm as a Clinical Liaison. I had received job offers from other companies. I decided to resign from GLC and I mulled over the job offers for approximately two weeks. Ultimately, I accepted the offer from Paradigm. I advised Paradigm of the Employment Agreement I had signed with GLC before the merger.

18. I submitted my thirty days' notice of resignation to GLC/Elara Caring on November 1, 2019, and called Mr. Steele to inform him of my decision. Mr. Steele was not happy that I was resigning. He was abrupt. He asked me where I was going and made a threatening comment to the effect of 'now you're not going to a competitor.' I did not tell him where I was going, as I had not yet decided for sure which job offer I was going to accept. I read the declaration signed by Mr. Steele in support of GLC's Motion for Preliminary Injunction ("Steele Declaration"). [ECF No. 5-2]. I never told Mr. Steele that I "dared" Elara Caring to stop me from going to Paradigm or anything to that effect. [Steele Declaration ¶ 15].

19. I began working for Paradigm on December 2, 2019, as a Clinical Liaison, with a base salary of $65,000. I am also eligible for bonuses of roughly $1,000 to $3,000 per month. My base salary at GLC/Elara Caring was around $65,000, plus quarterly bonuses of $1,000 to $3,000.

20. Prior to my start date with Paradigm, Paradigm required me to sign an acknowledgement of my confidentiality and non-solicitation obligations with regard to GLC. A true and accurate copy of the written acknowledgement, dated November 27, 2019, is attached as Exhibit 1. The acknowledgment mistakenly references a one year period for non-solicitation of GLC's customers (clients). Without admitting the legal enforceability of the non-solicitation

Page 5 of 13

provisions, I understand that the non-solicitation of clients provision in my GLC Employment Agreement has a two year period and I have been instructed by Paradigm, not to solicit customers (patients or proprietary referral sources of GLC/Elara Caring who were not already existing referral sources of Paradigm) for the remainder of the two year restricted period. Moreover, Jeff Jarecki, the Chief Executive Officer of Paradigm, instructed me not to share any confidential or other information of GLC/Elara Caring and, for two years after my termination of employment from GLC/Elara Caring, not to solicit any employees of GLC/Elara Caring to leave their employment or to work for Paradigm.

21. No one from Paradigm has ever asked me for any information about GLC/Elara Caring's specific business practices or processes, including its CAREtinuum program, or for any confidential information. I only have a general understanding of the CAREtinuum program. My understanding is that CAREtinuum is a patient transition program whereby GLC/Elara Caring identifies home health care patients who are candidates for hospice and transitions them to hospice. I do not know the specifics of how the CAREtinuum program works. I do not have any technical or working knowledge of Medalogix or any other software systems used in connection with CAREtinuum or the business models behind those programs.

22. Paradigm has never asked me to start up a patient transition program and I am not aware of any intention of Paradigm to start a patient transition program, including a program like CAREtinuum. I have not had any discussions with Paradigm regarding starting a patient transition program.

23. Paradigm and GLC/Elara Caring are different companies, with different business models. GLC/Elara Caring provides home health, hospice, behavioral health and personal care services to patients. At the time of my resignation, GLC accepted only patients who were on

Medicare or had insurance through United Insurance or Anthem Blue Cross Blue Shield. GLC/Elara Caring uses its CAREtinuum program to develop hospice service business; however, I was never involved in GLC/Elara Caring's hospice line of business and did not market hospice care services during my employment with GLC/Elara Caring. I only marketed home health care services. Therefore, as explained above, I only have a general understanding of the overall purpose of the CAREtinuum program but do not know any of the specifics of that program. GLC/Elara Caring's approach to business development is different than Paradigm's approach. At GLC/Elara Caring, I worked individually in my own territory. I was required to make 10-15 sales calls per day for home health business and to get 30 Medicare admissions for home health each month.

Paradigm provides home health, palliative, hospice and wellness care to patients. Paradigm accepts private pay, commercial insurance, managed care insurance and Medicare. At Paradigm, I work on a team of three people who manage a territory. Our team works together and when we receive a referral for hospice, we divide up the responsibilities to meet our hospice admission requirements. Paradigm relies upon quality care and customer service from its direct care employees to grow hospice services. Paradigm does not have a patient transition program like CAREtinuum. Paradigm does not need and has not expressed any interest in a patient transition program.

24. As a Clinical Liaison with Paradigm, I market primarily hospice services. I do very little marketing of home health and palliative care services. My main or primary territory is in Hamilton County, Indiana (Carmel, Westfield, Noblesville), which is an area that I did not market in when I worked for GLC/Elara Caring. I also market Paradigm's hospice services in Tipton and Madison counties. I do not market services in Howard County (Kokomo). As

explained in more detail in paragraph 33 below, on one occasion, I assisted Paradigm with setting up a booth at a vendor fair at Community Howard Regional Hospital in Kokomo ("Community Howard"), but I have not had any other involvement with Community Howard. I have not solicited Community Howard or other patient referral sources in that area, including a skilled nursing home facility in Waterford, Indiana, as alleged by Stephanie Brutus (through hearsay) in her declaration. [ECF No. 5-3].

25. Paradigm's patient referral sources in the counties I have marketed in on behalf of Paradigm (Hamilton, Tipton and Madison counties) existed before I was hired by Paradigm. I did not bring any new referral sources or referral relationships with me from GLC/Elara Caring. Paradigm was already doing business with those patient referral sources, including Community Hospital of Anderson. Paradigm's patient referral sources are the same as GLC/Elara Caring's referral sources in terms of hospitals, doctors and long term care facilities. All of those patient referral sources are sources that are readily available to the public and are not proprietary to GLC/Elara Caring and are not "Elara's referral sources" as alleged in GLC's Motion for Preliminary Injunction. [Steele Declaration ¶¶ 3, 11 and 12]. In this same respect, ¶27 of the Steele Declaration is patently untrue.

26. With respect to IU (Indiana University) hospitals, in my tenure at GLC, I only called on IU Ball Memorial and IU Tipton. I did not call upon any other IU hospitals.

27. All of Paradigm's patient referral sources with whom I have had contact with on behalf of Paradigm were existing referral sources of Paradigm when I started working for Paradigm. To the best of my knowledge, Paradigm has not gained any new referral sources as a result of my employment. I did not and have not introduced any new patient referral sources to

Paradigm. Furthermore, I have not used any GLC/Elara Caring private or confidential information to leverage those referral relationships for Paradigm.

28. When I worked for GLC/Elara Caring, I only marketed home health care services. I did not market hospice services. I did not have access to and do not know GLC's pricing information (what GLC charges patients or what GLC recoups from Medicare) for hospice services or its hospice patients. I only had access to home health patients and referral sources. GLC's hospice and home health lines of business were separate and distinct. I did not receive training or information specific to marketing of hospice services when I was at GLC.

29. I have conducted a thorough search. I do not have and I have not shared any confidential or proprietary business information about GLC/Elara Caring with Paradigm, including customer names, referral sources specific to GLC/Elara Caring, pricing information, sales figures, patient referral figures, patient information, clinical information, or its processes, procedures or business strategies or plans, and no one from Paradigm has ever asked me for any such information.

30. On or before my last day of employment with GLC/Elara Caring, I went to the Kokomo branch and met with an HR representative and returned all GLC/Elara Caring property or documents that were in my possession. I did not take, and do not have, any GLC/Elara Caring property or documents.

31. No one from Paradigm has ever asked me for any GLC/Elara Caring documents or property, and I have not shared any GLC/Elara Caring documents or property with Paradigm. Paradigm has not asked for, and I have not shared, information about Elara Caring's CAREtinuum program, Medalogix, or its software systems (Home Care Home Base) with Paradigm.

32. I have not solicited any employees of GLC/Elara Caring to leave their employment or to work for Paradigm.

33. In ¶ 11 of the Steele Declaration, Mr. Steele states that I was responsible for covering Account Executive Stephanie Brutus on occasion (e.g., when she was on vacation) and working directly with GLC's patient referral source at Community Howard. [ECF No. 5-2]. This is not true. When Ms. Brutus took paid time off, her responsibilities were assigned to Account Executive Hospital Liaison, Shelley Sheneman. Ms. Sheneman called on the same referral sources/accounts as Ms. Brutus and knew or knows the contacts in Kokomo. In my nearly 4½ years of working for GLC/Elara Caring, I never called on any patient referral sources or accounts in Kokomo.

34. In ¶ 19 of the Steele Declaration, Mr. Steele alleges some hearsay regarding a conversation I had with Ms. Brutus on February 16, 2020. [ECF No. 5-2]. He claims I gave Ms. Brutus a "heads up" about me selling and marketing services to Community Howard on behalf of Paradigm so that there would not be any "awkwardness" between us. Mr. Steele's portrayal of our conversation is inaccurate. Ms. Brutus called me that morning. We had been friends and work colleagues. We had a pleasant conversation about our families. Ms. Brutus then asked me if I would ever consider coming back to Elara Caring and I immediately said no thanks. I told her that I was happy at Paradigm and felt valued as an employee. I asked her why my position had not been filled since it had been over 3 months. Ms. Brutus did not have an answer. I specifically told Ms. Brutus that Kokomo is not part of my sales territory at Paradigm. I had, however, been asked by Paradigm to assist Paradigm with setting up a booth at a meet and greet vendor fair at Community Howard. I told Ms. Brutus about that and that I hoped to see her there. I told her that I do not market in Kokomo for Paradigm and that I was only helping set up the

booth and, that is what I did. I helped set up a booth. Paradigm had numerous representatives at the event, including Jeff Jarecki, Gary Navarre, and others, who manned Paradigm's booth and did the marketing at that vendor event. I did not know or have any connections with people from the Community Howard. I left the event early after helping set up the booth. I never called on that account when I was with GLC/Elara Caring and I have not called on Community Howard for Paradigm.

35. I genuinely cared for Ms. Brutus as a friend and told her that if she ever needed anything to call me. I realize now, in hind sight, that Ms. Brutus was not interested in my well-being, as she pretended that morning, but was simply fishing for information to collect for this lawsuit. I have not had any communication with Ms. Brutus since that day. Furthermore, other than helping set up a booth at the Community Howard vendor fair, I have not been in Kokomo while working for Paradigm. I have not called upon or solicited Community Howard for business on behalf of Paradigm.

36. In ¶ 21 of the Steele Declaration, Mr. Steele also states that in late February 2020, I called and solicited Elara Caring's nurses to come work for Paradigm and that I asked the nurses for specific Elara Caring referral source contact names and information. [ECF No. 5-2]. Mr. Steele does not identify the nurses but regardless, the statement is simply not true. I have never recruited or called any Elara Caring nurses for Paradigm. Furthermore, I did not try to solicit patient referral source names or information from Elara Caring nurses for Paradigm.

37. In ¶ 7 of Ms. Brutus's Declaration, she alleges that during my resignation period, I failed to introduce her to Elara Caring referral sources and accounts. [ECF No. 5-3]. This allegation is patently false. On or about Thursday, November 21, 2019, I went with Mr. Steele and Ms. Brutus to my top accounts at Elara Caring. These included IU Tipton (in Tipton,

Indiana), IU Ball Memorial (in Muncie, Indiana), and AMG Specialty Hospital (in Muncie, Indiana). In addition, I also introduced Ms. Brutus to Monty Brooks, Admission Director at Signature Health and Susan Campbell, Hospice Liaison for Premier Hospice. Ms. Brutus was given the opportunity to hand out her business cards to all referral sources, including Kim Presnall and Michelle Rodriguez, Case Managers at IU Ball Memorial, as well as Andrea Cooper at AMG Specialty Hospital. During these introductions, I told all of my contacts that Ms. Brutus was the new point of contact for Elara Caring. After visiting those accounts and having lunch together, I asked Mr. Steele and Ms. Brutus if they wanted to go to Community Hospital of Anderson. They responded that we had done enough that day. Due to scheduling conflicts, Ms. Brutus was not able to meet with me and the Case Managers at Community Hospital of Anderson; however, I provided her with the names of all the Case Managers.

38. I fully cooperated with Ms. Brutus and Mr. Steele in introducing Ms. Brutus to my patient referral contacts and continued to carry out my job responsibilities. I did not say anything negative about GLC/Elara Caring to any patient referral sources or take any actions to harm GLC/Elara Caring. On the other hand, I was informed that Mr. Steele and one of his other Elara Caring Account Executives, Suzanne Bradshaw, had talked to staff at Premier Health to find out if I had interviewed with Premier Health and to dissuade Premier Health from hiring me. Mr. Steele reportedly said negative things about me to Premier Health and told one representative of Premier Health that hiring me would be a mistake because I was "not a threat to anyone in the hospice field." I learned about this on or about November 4, 2019, and promptly sent an email to Mr. Steele the following day on November 5, 2019. I asked Mr. Steele to please refrain from talking negatively about me to others. Within a few minutes of receiving my email, I received an angry phone call from Mr. Steele. He called me a liar and yelled at me for sending

him the email. I told Mr. Steele that I had a right to protect my character and reputation. A true and accurate copy of my email to Mr. Steele is attached as <u>Exhibit 2</u>.

39. Paradigm has never asked me to solicit or recruit employees of GLC/Elara Caring to Paradigm and I have no intent to do so. Paradigm specifically instructed me <u>not</u> to solicit any GLC/Elara Caring employees to leave their employment or to work for Paradigm. Likewise, Paradigm has never asked me about GLC/Elara Caring's customers (patients or referral sources) or requested that I solicit or take away any GLC/Elara Caring customers. I am not aware of any referral sources or increase in market share that Paradigm has gained, at Elara Caring's expense, as a result of my employment.

**I DECLARE, UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT.**

Dated: 5/14/2020

Amy Stone

# Exhibit 1



November 27, 2019

Re: <u>Acknowledgment of Your Confidentiality and Non-Solicitation Obligations to Previous Employers</u>

Dear Ms. Stone:

This letter confirms our conversation about your confidentiality and other obligations to previous employers, including Great Lakes Caring (GLC). Please review and sign this Acknowledgement in the space provided below.

You understand and agree that Paradigm Health ("Paradigm") has hired you solely because of your general skills and abilities, and not because of your possession or knowledge of protectable, confidential, or trade-secret information belonging to any previous employer (if any such information exists), including GLC (hereinafter, "Previous Employer Information"). You agree that you have either destroyed all Previous Employer Information (whether in paper or electronic form) or returned it to your previous employer(s), such that you no longer possess any such Previous Employer Information in any format.

You further acknowledge that Paradigm does not desire to possess any Previous Employer Information, and expressly prohibits you from, directly or indirectly, using or disclosing (whether in paper or electronic form) any Previous Employer Information on behalf of Paradigm or in any other manner in connection with performing your responsibilities for Paradigm. This prohibition includes transferring or downloading any Previous Employer Information to any Paradigm server, system, or device, or disclosing it to any Paradigm employee or agent in any format.

You further acknowledge that for three hundred and sixty-five (365) days after your termination of employment from GLC, you shall not solicit any present or past customers of GLC

for the purpose of doing business with Paradigm. Further, for two years after the termination of your employment from GLC, you shall not have any contact with any past or present employees of GLC for the purpose of encouraging anyone to leave their employment with GLC. You shall not play any role in hiring anyone at Paradigm who was employed with GLC.

You understand that if you have any questions or concerns about a potentially prohibited disclosure or use (including whether something qualifies as such) or about other obligations contained in this Acknowledgement, you will immediately contact Jeff Jarecki for a determination about the appropriate course of action to: (a) avoid any such disclosure or use; (b) ensure compliance with the non-solicitations and no-hire provisions set forth in this Acknowledgement correspondence; and/or (c) any other contractual or statutory obligations you may have. You also understand and agree that any such disclosure, use, or breach of other obligation in violation of this letter will subject you to discipline by Paradigm, up to and including the termination of your employment.

Thank you for your review of this letter and your agreement to its terms.

Sincerely,

Jeff Jarecki, President

I have read and understood this letter and agree to its terms:

Name: Amy Stone                    Signature: Amy Stone

Date: 11/27/19

26700276.1

# Exhibit 2



Good Morning,

It was brought to my attention yesterday that my name and reputation was being dragged through the mud in the Indy market by an Elara Caring co-worker. This news came directly to me by a competitor in the Hospice field. I have been in healthcare as a sales representative for over 10 years now and I am very connected in my community. I strive on the amazing connections and relationships that I have built along with a dynamic work ethic. The specific phrases that came back to me include, "Amy Stone is no threat". "Amy Stone is not a go getter". I can assure you that building a territory from scratch with no local office twice with 2 separates companies does not come from someone who is not a go-getter.

It is my hope to end my almost 5 years of tenure with Great Lakes/Elara Caring in the most positive way that I can. I hope that all negative chatter will cease and that the person who replaces my position will also start their career on the right foot.

Best,



**Amy Stone** | Account Executive
c 765.437.7027 | f 877.395.0055 | astone@elara.com
Right Care • Right Time • Right Place